813 F.2d 402
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Lisa A. MILLER, Administratrix of the Estate of Raymond
Miller, deceased, Appellant,
v.
MECKLENBURG COUNTY; John Kelly Wall, personally and in his
official capacity as former sheriff of Mecklenburg County;
Charles Pellerin, personally and in his official capacity as
a Sheriff's Deputy for Mecklenburg County; Eric D. Moore,
personally and in his official capacity as Mecklenburg
County Pre-trial Release Counselor; Richard Lee Blanks,
personally and in his official capacity as Charlotte Police
Officer, Appellees.
 No. 85-2178.
 United States Court of Appeals, Fourth Circuit.
 Argued June 6, 1986.
Decided August 20, 1986.
 
 Before WINTER, Chief Judge, and WIDENER and HALL, Circuit Judges.
 Lawrence U. Davidson, III, for appellant.
 Edward Hinson, Jr. (James, McElroy & Diehl, P.A.; James O. Cobb; Ruff, Bond, Cobb, Wade & McNair; Grant Smithson; Frank B. Aycock, III, on brief), for appellees.
 PER CURIAM:
 
 
 1
 Lisa A. Miller, administratrix of the estate of Raymond Miller, brought an action pursuant to 42 U.S.C. Sec. 1983 and Sec. 1981, alleging violations of the decedent's civil rights by certain law enforcement officers of Mecklenburg County and the City of Charlotte, North Carolina. She appeals from an order of the district court denying her motion for judgment not withstanding the verdict ("judgment n.o.v.") and entering judgment pursuant to a jury verdict. Finding no error, we affirm.
 
 I.
 
 2
 Richard L. Blanks, a city police officer, responded to a complaint at the Red Carpet Inn in Charlotte, North Carolina, at approximately 2:00 a.m. on September 13, 1981. Arriving at the scene, he found Raymond Miller, a 41-year old black male, walking down the middle of a four-lane city street, shouting in a loud voice, staggering and swinging from side to side. According to his later trial testimony, Blanks, who was familiar with Miller from previous calls to the Red Carpet Inn where Miller resided, believed that he was intoxicated. Blanks concluded that Miller should be taken to the "Detox Center," a city facility maintained to hold persons while they are inebriated.
 
 
 3
 Blanks testified that when he had taken Miller into custody and started to the "Detox Center," Miller became disturbed and combative. Because the "Detox Center" would not accept people in an uncontrollable state, Blanks decided to take Miller to the Mecklenburg County Jail instead. According to Blanks' testimony, Miller pounded on the shield between the front and rear seats of the police car, shouted, and fell from side to side in the back seat of the patrol car while he was being transported.
 
 
 4
 Upon their arrival at the jail, Miller allegedly resisted strenuously the efforts by Blanks to remove him from the police car. Blanks then closed the door to the vehicle and requested assistance from inside the jail.
 
 
 5
 Pre-Trial Release Officer Eric D. Moore and Deputy Sheriff Amos Charles Pellerin responded to Blanks' request for assistance. Moore and Pellerin testified at trial that Miller resisted being taken into the jail. There was a dispute of fact between Pellerin and Blanks on one side and Moore on the other about precisely what happened as Miller was taken into the jail and to the "drunk tank." Moore testified that Pellerin kicked Miller with a blow that glanced off Miller's chest and struck him in the head as the three officers struggled to bring Miller into the jail. Pellerin denied he kicked Miller. Blanks did not witness such a kick.
 
 
 6
 Miller was taken inside the jail to an area known as the "booking room." Moore testified that as he turned to leave slaps were heard, and when he turned around, he saw Pellerin slapping Miller. Pellerin denied slapping Miller and Blanks did not witness any slaps.
 
 
 7
 Following the booking procedure, Miller was taken down a hallway to the "drunk tank." Moore said that Pellerin kicked Miller a second time at or near the entrance to the "drunk tank." Pellerin denied having kicked Miller at that point; Blanks did not witness such a kick; and Thomas Jackson, an inmate inside the drunk tank, did not witness any kick. Jackson did testify, however, that Miller was dropped into the cell in a semi-conscious condition and appeared to die shortly thereafter. Jackson claimed when his efforts to summon help from the jail staff proved unavailing, he went to sleep. Miller's body was not found until later in the morning.
 
 
 8
 When Miller's body was discovered, it was moved to the Mecklenburg County morgue, where an autopsy was performed by H.R. Wood, M.D., County Medical Examiner. Dr. Wood testified at trial. The autopsy report was also introduced into evidence. The report noted a series of superficial abrasions which could have resulted from a person tripping or falling and crawling on his hands and knees. Causes of death were noted as "subdural hemorrhage, fatty liver and alcoholism." A contributing cause of death was "coronary arteriosclerosis." The Medical Examiner testified that he did not believe the subdural hemorrhage observed "would in and of itself have caused death." Dr. Wood further stated that he believed that the physical condition of Miller as observed by Blanks before he was taken into the jail could have been consistent with someone already suffering from a subdural hemorrhage.
 
 
 9
 In 1983, Moore informed his supervisors at the county jail that he had witnessed a murder, referring to the death of Raymond Miller. In December of 1983, Miller's body was exhumed and a second autopsy was conducted by the State Medical Examiner's Office. The second autopsy report, which was admitted in part[1] at trial, concluded that the cause of Miller's death could not be determined. John Butts, M.D., who was present at the second autopsy, testified that in his opinion Miller died of a combination of factors, including a pre-existing liver disease, alcoholic in nature, and blunt force trauma. The pathologist, Robert Thompson, M.D., who actually performed the second autopsy was not called to testify.
 
 
 10
 Additional medical testimony was provided at trial by Dr. Gordon K. Klintworth, a professor of pathology at Duke University Medical Center, who concluded from his review of the two autopsies that the subdural hemorrhage described could not have killed Miller. Dr. Klintworth testified that a "fatty liver" can explain sudden death "in individuals that imbibe excessive amounts of alcohol." Dr. Klintworth concluded there were a number of possible explanations for Miller's death, including the fatty liver and "arrhythmia associated with severe coronary arteriosclerosis."
 
 
 11
 On September 9, 1983, even before the second autopsy, Lisa Miller, acting as administratrix of the estate of Raymond Miller, filed this action for violation of decedent's civil rights under 42 U.S.C. Secs. 1983 and 1981, and for wrongful death. Defendants in the case included Mecklenburg County, former Sheriff of Mecklenburg County John Kelly Wall, Mecklenburg County Deputy Sheriff Amos Charles Pellerin, Mecklenburg County Pre-Trial Release Officer Eric Moore, and Charlotte Police Officer Richard L. Blanks.[2]
 
 
 12
 Following extensive discovery, trial began on August 19, 1985. At the close of all the evidence, the court entered a directed verdict in favor of the County, Wall, Moore, and Blanks. The Court allowed the case against Pellerin to reach the jury. On August 26, 1985, the jury found no liability on the part of Pellerin. Plaintiff moved to set aside the verdict. She also moved for a new trial, for a judgment notwithstanding the verdict, and for a mistrial. All motions were denied and judgment was entered on October 4, 1985. This appeal followed.
 
 II.
 
 13
 On appeal, appellant asserts that numerous errors in the proceedings below require either that a new trial be granted or that judgment be entered in her favor. Specifically, she argues that (1) she was denied a fair and impartial jury by the failure of a prospective juror to respond truthfully to questioning during voir dire; (2) the trial court abused its discretion in granting defendants' motion in limine prohibiting any reference by plaintiff's counsel or witnesses to a carotid suppression hold allegedly applied against the decedent; (3) the trial court erred in granting a directed verdict in favor of some of the defendants; (4) the trial court erred in instructing the jury; and (5) the trial court erred in denying plaintiff's motion for judgment n.o.v. We find no merit in any of appellant's contentions.
 
 
 14
 Appellant's contention that she was denied a fair and impartial jury turns upon an admittedly incomplete answer given by a juror during plaintiff's portion of voir dire. In response to the question posed by plaintiff's counsel concerning whether any members of the jury or their families were or had been police officers, one juror responded that he was a "security supervisor." During later questioning by defense counsel, the same juror revealed that he had been a deputy sheriff eight years earlier. Appellant argues that the juror's incomplete response to her attorney's inquiry fatally undermined her ability to exercise her right of peremptory challenge and, thereby, deprived her of a fair and impartial jury. We find this argument singularly unpersuasive.
 
 
 15
 As a threshold matter, we note that at the time appellant learned of the juror's law enforcement background, she had unused peremptory challenges available. We find nothing in the record to indicate that appellant's trial counsel ever attempted to reopen the examination of the juror or to exercise the remaining challenges. Furthermore, appellant failed to offer any contemporaneous objection to the inclusion of the particular juror in the trial jury. Under these circumstances, it is not unreasonable to conclude that appellant has waived any objections that she might have to the composition of the jury. See United States v. Webster, 639 F.2d 174 (4th Cir.1981), Morton v. Welch, 162 F.2d 840 (4th Cir.), cert. denied, 332 U.S. 779 (1947).
 
 
 16
 Even assuming that appellant has not waived her right to object to the selection of the jury, we see no basis for concluding that the jury in this instance was not "fair and impartial." No effort has been made in this appeal to establish any actual bias or partiality by the juror in dispute. At most, appellant has demonstrated that the juror's failure to respond fully to her voir dire inquiry created a technical impediment to the timely exercise of peremptory challenges. Such a minor event, particularly when the affected party did not promptly seek available means of redress, cannot sustain a challenge on appeal to the composition of the jury. Accordingly, we hold that appellant was not deprived of a fair and impartial jury.
 
 III.
 
 17
 In her amended complaint, appellant alleged that deputy Pellerin "administered a strangulation hold on the decedent, causing the decedent to lose consciousness and later to lose his life." All defendants vigorously denied that Miller had been choked by anyone. Arguing that discovery had not revealed any admissible evidence in support of plaintiff's amended allegation, defendants sought by motion in limine to exclude any mention of the terms "choke hold," "carotid sleeper" or "carotid suppression hold." After reviewing the evidence developed during discovery, the court granted the motion and instructed counsel as follows:
 
 
 18
 Unless otherwise authorized by the Court, all parties and their attorneys are instructed to avoid the use of the terms strangulation hold, choke hold, carotid sleeper hold, carotid suppression hold or any similar hold unless the Court in camera, outside the presence of the jury, has authorized the use of such question.
 
 
 19
 Appellant now argues that the district court's ruling was an abuse of discretion under Fed.R.Evid. Rule 403[3] which prevented her from fully presenting her case to the jury. Specifically, appellant contends that the ruling excluded a portion of the second autopsy report in which the examining pathologist discussed the likelihood that Miller's death resulted from strangulation. Additionally, appellant argues that the ruling fatally restricted her ability to effectively examine her expert witness, Dr. Butts. We are unconvinced by appellant's argument.
 
 
 20
 A motion in limine seeking to exclude from trial material of an allegedly prejudicial nature is a matter entrusted to the sound discretion of the trial court. United States v. Jackson, 757 F.2d 1486, 1491 (4th Cir.1985). Here, the court limited only the use of specific language or "buzz words" bearing a highly emotional content for which no evidentiary predicate had been shown. Nothing in the court's ruling prevented appellant from attempting to prove that Mr. Miller had been choked. As the court instructed plaintiff's expert, Dr. Butts:
 
 
 21
 Now, this doesn't mean that you cannot describe whatever pathology you found or draw any conclusions medically feasible from the pathology, but let's don't use any of those buzz words.
 
 
 22
 ... If the evidence medically supports a reasonable medical opinion that he died from being choked, I see no reason that couldn't be said, but there is not any evidence before the jury of pressure on the neck. There is no evidence before the jury that he was choked. There is evidence that he was kicked in the chest and the blow glanced off and his his head, kicked on the chest and head in one pass, but my caution is don't refer to those types of holds.
 
 
 23
 It is clear from the court's instruction that plaintiff was free to elicit from Dr. Butts or any other witness, testimony to show that Mr. Miller had been choked. She was unable to do so.[4] In light of that failure, the court's decision to restrict use of "buzz words" relating to such an injury cannot be faulted.
 
 
 24
 We also see no error in the court's decision to exclude from evidence the last two pages of the 1983 autopsy report. Although officially stating in the first three pages of his report that the cause of death could not be determined, the pathologist, Dr. Thompson, had engaged in some speculation on possible causes in the last two pages. In that portion of the report, Dr. Thompson stated that "it is certainly possible" that Miller was killed by a stranglehold.
 
 
 25
 In response to pre-trial discovery requests by defendants, plaintiff had provided only the first three pages but sought to introduce the full document into evidence at trial. The court concluded that this abuse of the discovery process merited sanction pursuant to Fed.R.Civ.P. 37(d) and Fed.R.Civ.P. Rule 37(b)(2)(B).[5]
 
 
 26
 Even assuming that the challenged pages were not otherwise objectionable under the Rules of Evidence, we can see no error in the court's decision to exclude them in this instance. By her own action in failing to comply with the rules of discovery, appellant created a clear possibility of unfair surprise. The potential for prejudicial damage was increased by the fact that she did not intend to call the author of the autopsy report as a witness, thereby depriving the defendants of any meaningful opportunity to counter the harmful effect of the hitherto unrevealed evidence.
 
 
 27
 In sum, we find no abuse of judicial discretion in the court's evidentiary rulings and no basis for appellant's contention that her ability to present her case was impeded in any way.
 
 IV.
 
 28
 At the conclusion of all of the evidence, the district court ordered the entry of a directed verdict in favor of all defendants except Pellerin. The court based that action upon its finding that there had been no showing of an official policy to permit or sanction the use of unreasonable force against prisoners at the Mecklenburg County Jail. Appellant now argues that under Grandstaff v. City of Barger, Texas, 767 F.2d 161 (5th Cir.1985), an alleged "cover up" should have been considered as evidence of official policy. We find no merit in that contention under the facts of this case.
 
 
 29
 The district court did not refuse to consider the possibility of a "cover up." Indeed, the court expressly noted that some effort had been made by certain individuals to conceal information. Notwithstanding those efforts, however, the court still concluded that there was not a sufficient showing of official policy to prevent a directed verdict in favor of those defendants who were not accused of actually inflicting Miller's injuries. We have found nothing in this appeal to undermine the district court's conclusion.
 
 
 30
 In any event, the existence of official policy in section 1983 actions becomes significant only if there is an underlying violation of civil rights. In this instance the jury found, however, that no violation of Raymond Miller's civil rights occurred. In light of that determination, we decline to consider the extent to which evidence of a subsequent effort to conceal a civil rights violation by some officials can be used to establish government policy. Rather, we hold that the appellant has shown no prejudice and, thus, no reversible error in the district court's decision to grant a directed verdict in favor of some of the defendants below.
 
 V.
 
 31
 Appellant contends that the district court committed sins of both omission and commission with regard to the instructions given the jury in this case. She argues that the court erred by declining to instruct the jury on a number of points as she requested. Appellant further argues that by offering an instruction that quoted this Court's reasoning in King v. Blankenship, 636 F.2d 70 (4th Cir.1980), the district court incorrectly stated the standard for evaluating a claim of constitutionally excessive force and improperly injected the issue of the defendants' intent[6] into the civil rights action. We conclude that appellant's objections to the jury instructions are without merit.
 
 
 32
 Our review of the transcript convinces us that virtually all of the instructions sought by plaintiff below were given in substance, although not in the exact form requested. A party has no right to the precise wording of a proposed instruction. It is sufficient if the instructions taken as a whole "fairly and adequately" state the applicable legal principles. Hoggs Oyster Co., Inc. v. United States, 676 F.2d 1015 (4th Cir.1982).
 
 
 33
 With regard to the King v. Blankenship instruction, we note that there is no indication in the record that appellant offered any contemporaneous objection to that instruction. Failure to object to a jury instruction at trial amounts to a waiver of any right to raise the issue on appeal. Haywood v. Ball, 586 F.2d 996 (4th Cir.1978). Appellant's suggestion at oral argument that she avoided a procedural default on this issue through a general objection to the court's instruction on "constitutional injury" is unpersuasive. Absent any indication of a timely and specific objection, we hold that appellant waived any claims of error she might have predicated upon the instructions given the jury in this instance.
 
 VI.
 
 34
 Finally, we see no merit in appellant's contention that she was entitled to judgment n.o.v. The gravamen of appellant's action was a claim that Raymond Miller died as a result of injuries wrongfully inflicted by County and City officers on September 13, 1981. The question of whether any officer actually injured Miller as well as the ultimate cause of his death were disputed at trial. A number of witnesses testified and extensive medical evidence was presented. There was, therefore, clearly a basis for fair minded people to differ on the proper resolution of the dispute. Only if reasonable people could reach no other conclusion than that asserted by appellant would judgment n.o.v. have been appropriate. Frith v. Eastern Airlines, Inc., 605 F.2d 128 (4th Cir.1979). That was simply not true in this instance.
 
 VII.
 
 35
 For the foregoing reasons, the order of the district court denying judgment n.o.v. and entering judgment on behalf of the defendants below is affirmed.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 The report consisted of five pages. The first three pages were admitted. For reasons discussed in Section III, infra, of this opinion, the last two pages were excluded. The exclusion of those pages is one of the issues in this appeal
 
 
 [2]
 Blanks was not an original defendant, but was added on January 24, 1984. Wall, Pellerin, Moore, and Blank were all sued in both their individual and official capacities
 
 
 [3]
 Federal Evidence Rule 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 [4]
 Dr. Butts was specifically asked by plaintiff's counsel for his medical opinion concerning the cause of Raymond Miller's death. Butts opined that Miller had died from a combination of liver disease and blunt force trauma. No mention was made of strangulation
 
 
 [5]
 Pursuant to these rules, the court may punish noncompliance in discovery by "prohibiting ... [a party] from introducing designated matters into evidence."
 
 
 [6]
 The court instructed the jury to consider "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm." That language, which originated in Johnson v. Glick, 481 F.2d 1028 (2nd Cir.), cert. denied sub nom. John v. Johnson, 414 U.S. 1033 (1973), was recently cited with favor in Whitley v. Albens, --- U.S. ----, 54 U.S.L.W. 4236 (1986)